**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-639 (DLF)** |
| **v.** | : | |
| | : | |
| **ANTHONY SARGENT,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Anthony Sargent to 46 months' incarceration, which is the middle of the advisory Sentencing Guidelines range, 36 months' supervised release, $2,980 restitution, and special assessments totaling $220.

## I.     INTRODUCTION

The defendant, Anthony Sargent, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

During the attack, Sargent (1) grabbed and pushed a police officer to prevent him from detaining another rioter; (2) twice shoved two officers away from the Capitol as they tried to retreat to safety; (3) twice threw a heavy object at a set of doors leading into the Capitol with the intent to break the doors' glass panels, while officers stood behind those doors; and (4) encouraged other rioters to damage the same set of doors. Sargent's violence was not spontaneous—as a member of the Proud Boys, he vocalized his support for a riot and civil war on the group's messaging platform in the lead-up to January 6.

The Court must also consider that Sargent's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the government recommends that the Court sentence Sargent to 46 months' incarceration, which is in the middle of the government's calculated Guidelines' range of 41 to 51 months and reflects the gravity of Sargent's conduct and the need for deterrence.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  The January 6, 2021 Attack on the Capitol

The government refers the Court to the affidavit filed in support of a criminal complaint in this case, ECF No. 1-1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.  Sargent's Role in the January 6, 2021 Attack on the Capitol**

*Messaging Leading up to January 6*

Prior to January 6, Sargent, a member of the Proud Boys, was an active participant in Telegram group chats operated by the group. In those chats, Sargent made clear his intent to use illegal and violent means to contest President Biden's defeat of former President Trump in the November 2020 presidential election. *See generally* PSR ¶¶ 10-15.

In November 2020, Sargent discussed the need to resist and riot:

- November 8, 2020: "[…] true physical resistance is coming."

- November 19, 2020: "While we must learn from and study history our path to the same old autrocities [sic] is totally diffrent [sic] […] We need to go ahead and get us some autrocity [sic] too [...] Let's riot too […]"

By mid-December 2020, Sargent's messages were more violent and radical. He urged his fellow Proud Boys to take action. Sargent also discussed the certification of the presidential election, his belief that the election was "rigged," and the likelihood of violence:

- December 14, 2020: [In a thread where Proud Boys were discussing the election results.]: "There is this date they cert and January 4th[2] date where congress [sic] can not accept the electoral college cert and say it is in dispute."

- December 15, 2020: "[…]Let's remind ourselves [the Proud Boys] we [the Proud Boys] were just hammered and taking over several city blocks and chasing people down and beating them[…]"[3]

- December 15, 2020: "[…]When it become elections [sic] are no longer real did that not change this? So is a one party system fine and ok and we do nothing? We don't

---

[2] Later messages reveal that Sargent learned the date of the certification was January 6, 2021.

[3] On December 12, 2020, Sargent and several other Proud Boys attended a rally in Washington, DC to protest the election results. *See* https://www.washingtonpost.com/local/public-safety/trump-rally-violence-proud-boys/2020/12/14/bf2f5826-3e26-11eb-8bc0-ae155bee4aff_story.html   (last accessed August 1, 2023). After the rally, D.C. officials blamed violent clashes that occurred that day on the Proud Boys. *Id*. Sargent appears to be referencing his participation in the December 12, 2020 rally here.

lead the rest of the half of the county that cares it was rigged to do something about it?....I think we are at war and just keep hoping we are not. [...]"

- December 15, 2020: "[...] Is it not our duty if the election is rigged as citizens to stop this? The next couple weeks is going to be crazy not just for pb [Proud Boys] but for half the nation in either direction that feels absolutely cheated.... That is when civil war happens... [...]"

- December 15, 2020 [Sargent responds to the following prompt: "Do you want to party like it's 1999 or do you want to party like it's 1775?"]: "I'll take 1775. Alex for the win. What is the tree thirsty?"[4]

By the end of December 2020, Sargent's messages revealed his intent for his actions on January 6: "storm the [C]apitol." He also indicated that he knew those actions would be illegal— that going to the Capitol would "get us marked as terrorist and jail [sic]." In various messages, Sargent not only made his own intentions clear but encouraged the use of violence by others:

- December 21, 2020: "I am seeing many pb [Proud Boys] waiver to idea and saying just gonna go to work and pretend the election wasn't riggered [sic]. Going to capitol will just get us marked as terrorist and jail [sic]. [...] The election was stolen, I am going in colors or not in colors."

- December 31, 2020 [discussing an article that describes a conspiracy theory relating to Jeffrey Epstein and the Chief Justice of the U.S. Supreme Court John Roberts]: "And where is his whore master? That cunt just locked up no trial? Wtf is going on. Fuck it storm the capitol [...] In mindcraft[5] [sic]"

- January 2, 2021 [Sargent responds to a message stating "It's a done deal right? Electoral college votes on 6th?"]: "What is a done deal? [...] A million patriots standing the capitol may not think so [sic]"

- January 2, 2021 [Sargent responds to a message stating, "This current iteration of America is toast. It's fast becoming a third-world dump of passive idiots…Time

---

[4] Sargent appears to be referencing a quote from Thomas Jefferson: "the tree of liberty must be refreshed from time to time with the blood of patriots & tyrants." *See* https://www.loc.gov/exhibits/jefferson/105.html (last accessed August 1, 2023).

[5] The government understands that it is common for persons discussing criminal activity online to refer to such activity as occurring "in Minecraft" to conceal the true nature of the activity. *See* https://www.techspot.com/news/97998-4chan-user-arrested-posting-minecraft-death-threat.html (last accessed August 2, 2023) (explaining how an online commenter added the phrase "in Minecraft" in an attempt to make his threat seem hypothetical).

for a restoration."]: "200k patriots standing at the capitol pissed the fuck off can't be good."

At 8:04 p.m. EST on January 6, 2021, Sargent sent a text message indicating he knew that Congress was trying to certify the election, stating, "What at [sic] they saying did they certify yet[.]" About two and a half hours later, perhaps realizing the seriousness of his conduct, he texted the same person: "[d]elete please," plainly intending to destroy evidence of his offenses.

### Damage to the North Door of the Capitol

Sargent and five associates traveled from the Florida area in a rented van and arrived in Washington, D.C. on January 5, 2021. At approximately 3:30 p.m., Sargent joined a mob of rioters gathered in the restricted area outside the North Door entrance to the U.S. Capitol. A group of police officers was standing outside of the North Door when Sargent and other rioters collectively pushed against the officers. *See* Gov't Ex. 4A[6] at 0:00-0:19; Figure 1. After the officers retreated into the Capitol, Sargent and other rioters pursued them. *See* Gov't Ex. 7 at 11:15-12:48 (Sargent visible from 12:30-12:38); Figure 2. Sargent and the rioters, however, were stopped by a set of doors locked by the officers. *Id.*

---

[6] Where it helps the viewer, the government has annotated its videos. Exhibits marked with "A" are annotated or clipped versions of video. For example, Gov't Ex. 1A is the annotated or clipped version of Gov't Ex. 1. The video exhibits will be fully explained in the Exhibit Notice that will be filed along with the exhibits by November 2, 2023.



*Figure 1: Sargent (red) joining the mob in a collective push against a small group of officers*



*Figure 2: Sargent (red) approaches the North Door shortly after officers retreated*

Around this time, Sargent also led a group of rioters in a call and response of "Whose House?! … Our House!" Gov't Ex. 2A. Additionally, on at least two occasions, police officers sprayed Sargent and other rioters to try and remove them from the area. Gov't Ex. 4 at 10:10-10:15; Gov't Ex. 3 at 2:23-2:30. However, the police's efforts to keep rioters away failed to discourage Sargent, who was determined to break into the Capitol Building.

At approximately 4:00 p.m., Sargent told another rioter, "I need like a rock to break the glass," in reference to the glass panels of the North Door. *See* Gov't Ex. 3A.1 at 0:06-0:14. He then yelled at other rioters to "get a gate to ram it," also in reference to the North Door. *Id.* at 0:15-0:29. Shortly after Sargent made those statements, Sargent held a bicycle rack at the base of the steps leading up to the North Door. *See* Gov't Ex. 5A, 0:00-1:00; Figure 3. As Sargent looked on, two rioters used the bicycle rack as a battering ram against the doors. *See* Gov't Ex. 5A; Figure 4. Officers responded by deploying a fire extinguisher into the North Door vestibule. *See* Gov't Ex. 5A, 0:52-1:00.



*Figure 3: Sargent (red) holding the bicycle rack that rioters used as a battering ram shortly afterwards*



*Figure 4: Rioters using a bicycle rack to break down a set of doors*

Then, while fire extinguisher discharge was visible in the air, Sargent picked up a heavy object approximately the size of a softball and hurled it at the inner set of doors. *See* Gov't Ex. 1 at 4:39-4:46. When Sargent threw the object, police officers stood directly behind the inner set of doors. Sargent likely knew the officers were just behind the doors because an officer had just discharged a fire extinguisher from behind those doors. *Id.*; Figure 5.

Sargent then retrieved the object from the ground and threw it at the doors again. *See* Figures 5-6; Gov't Ex. 1 at 4:46-4:55. Sargent hurled the object both times with such force that it can be heard striking the doors on the video captured 15-20 feet away over the sound of a blaring alarm. Gov't Ex. 6A at 0:08-1:09. Furthermore, each time he threw the object, the CCTV camera in the hallway nearest the doors shook. Gov't Ex. 1A at 1:57-2:25.



*Figure 5: Sargent (red) throwing the object at the doors*



*Figure 6: The object (red) visible in Sargent's right hand*

Afterwards, Sargent said through his neck gaiter, "it's ballistic,"[7] referring to the rioters'

failure to damage the doors' glass panels. *See* Gov't Ex. 3A.2; *see also* Gov't Ex. 3A.3 (showing

---

[7] Ballistic glass is engineered to stop projectiles thrown at it.

Sargent's mouth moving as he says "it's ballistic."). Nevertheless, the doors themselves were damaged, and the Architect of the Capitol later determined that the rioters caused $980 in damage to those inner doors.

### *Obstruction and Assault of Two U.S. Capitol Police Officers*

At approximately 4:12 p.m., three United States Capitol Police ("USCP") officers arrived at the North Door from the east side of the terrace and stood between the rioters and the door. *See* Gov't Ex. 7 at 16:55-18:48. One of the officers, Officer 2, attempted to reason with the rioters to calm them down and convince them to leave the area. After about 90 seconds, a rioter sprayed Officer 2 with some kind of chemical irritant. *See* Figure 7; Gov't Ex. 7 at 18:48.



*Figure 7: Officer 2 (blue) with orange chemical irritant above his eye; Officer 1 is circled in yellow; Officer 3 is circled in green.*

After recoiling from the assault, Officer 2 told the other officers to detain the rioter (hereinafter "the Sprayer") who had just assaulted him.[8] *See* Gov't Ex. 7 at 18:50. As Officer 1 moved towards the Sprayer, Sargent grabbed onto Officer 1 and prevented him from detaining the Sprayer. *See* Gov't Ex. 7A; Figure 8. At his change of plea hearing, Sargent himself admitted that he physically separated the rioter from Officer 1 with the intent to impede or disrupt one or more officers. Gov't Ex. 8, Plea Hrg. Tr., Jul. 21, 2023 at 20:2-3 ("I picked [the Sprayer and Officer 1] both up and separated them so that [Officer 1] couldn't continue what he was doing."). Over a period of roughly 13 seconds, Sargent pushed Officer 1 further into the chaos of the mob and away from the North Door. Gov't Ex. 7A; Gov't Ex. 7 at 18:59-19:12 (showing same action as Gov't Ex. 7A, but without pauses, so the viewer can easily track what occurs over the 13 second period); Figure 9.



*Figure 8: Sargent (red) grabs onto Officer 1 and drives him away from the North Doors.*

---

[8] The third officer, Officer 3, was pulled into the building by the police, so he did not go out with Officer 2.



*Figure 9: Sargent (red) pushing Officer 1 out into the mob and blocking his return to the North Door*

Officer 2 forced his way through the teeming mob to assist Officer 1, but had difficulties making his way to his fellow officer. Gov't Ex. 7A at 0:15-0:47. It took Officer 2 about 17 seconds from the time Sargent first grabbed Officer 1 to reach the area where Sargent had pushed Officer 1. Gov't Ex. 7 at 18:55-19:12. When Officer 2 reached Sargent, Officer 2 later reported that Sargent told him to leave the area, which the officer declined to do. Officer 2 also asserted Sargent then helped Officer 2 get to Officer 1 and that Sargent appeared to tell the mob to let Officer 1 go and stop fighting. Lastly, although Officer 2 had no recollection of the events depicted in Figure 8 above and even though it had taken Officer 2 about 17 seconds to reach the area where Sargent had pushed Officer 1, Officer 2 indicated in an interview that Sargent was not aggressive toward Officer 1.

Officer 2 eventually reconnected with Officer 1 and the two tried to move back towards the North Door. Sargent, however, grabbed onto Officer 2's arm as the mob pushed the two officers away from the North Door. Gov't Ex. 9A. Sargent stayed close to the officers, at one point waving his hand at Officer 1 while shaking his head from side to side, appearing to discourage the officers from returning to the North Door. *Id.*; Figure 10. Video then shows Sargent twice shoving the two officers further into the mob and away from the North Door. Gov't Ex. 9A at 0:26-0:46; Figure 11. Accordingly, Sargent assaulted the officers in order to impede and obstruct them from guarding the North Door.



*Figure 10: Sargent (red) motioning Officer 1 (yellow) away from the North Door; Officer 2 is circled in blue and turned away from Sargent.*



*Figure 11: Sargent (red circle) pushing Officers 1 (yellow circle) and 2 (blue circle) a second time.*[9]

---

[9] The government provided the same image to the U.S. Probation Officer in this matter. In that image, the government incorrectly stated that the hand on Officer 2 belonged to Sargent. PSR ¶ 25. However, the hand in question is actually the hand of the rioter in the maroon hooded sweatshirt also visible in Figure 11.

### III.     THE CHARGES AND PLEA

On April 22, 2022, a federal grand jury returned a superseding indictment charging Sargent with seven counts: civil disorder, in violation of 18 U.S.C. § 231(a)(3), destruction of government property, in violation of 18 U.S.C. §§ 1361 and 2, entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1), disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2), engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4), disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D), and act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(G). ECF No. 19. On July 21, 2023, Sargent was convicted of those offenses based on a guilty plea entered without the benefit of a plea agreement.

### IV.     STATUTORY PENALTIES

Sargent now faces sentencing on all counts of the superseding indictment. ECF No. 19. As noted by the Presentence Report issued by the U.S. Probation Office, for Count One, Sargent faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100. PSR ¶¶ 100, 103, and 117. As to Counts Two through Five, Sargent faces up to 1 year of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25. *Id.* As to Counts Six and Seven, Sargent faces up to 6 months of imprisonment, a fine of up to $5,000, and a mandatory special assessment of $10. *Id.*

### V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). The government disagrees with the Probation Officer's Guidelines calculation resulting in

a total offense level of 23, but agrees with the Probation Officer's calculation of Sargent's criminal

history category as I. PSR ¶¶ 73, 77.[10]

With respect to Counts One and Two, the government agrees with the PSR's analysis. *See*

PSR ¶¶ 26-27. The government disagrees with the PSR's analysis with respect to Count Three. *See*

PSR ¶ 28. The official victim enhancement under U.S.S.G. § 3A1.2 should not apply. The victim

of the § 1752(a)(2) offense of "entering and remaining in a restricted area" is Congress, as the PSR

states, not an officer. PSR ¶ 29. The government also disagrees with the PSR's analysis with

respect to Count Four. *See* PSR ¶ 29. The cross-reference under U.S.S.G. § 2A2.4(c) should not

apply because the conduct does not constitute "aggravated assault." The notes to U.S.S.G. § 2A2.2

define "aggravated assault" to mean "a felonious assault" that meets certain additional criteria, but

the conduct underlying this § 1752(a)(2) conviction is not felonious. The government agrees with

the PSR's analysis of Count Five. Thus, the applicable Guidelines are as follows[11]:

**Count One – 18 U.S.C. § 231(a)(3):**

| | | |
|---|---|---|
| U.S.S.G. §2A2.4 | Obstructing or Impeding Officers | **10** |
| U.S.S.G. §2A2.4(b)(1)(A) | Specific Offense Characteristic (Physical Contact) | **+3** |
| U.S.S.G. §2A2.4(c)(1) | Cross Reference | |
| U.S.S.G. §2A2.2 | Aggravated Assault | **14** |
| U.S.S.G. §3A1.2(a)-(c) | Official Victim | **+6** |
| | Total | **20** |

**Count Two – 18 U.S.C. § 1361:**

| | | |
|---|---|---|
| U.S.S.G. §2B1.1(a)(2) | Property Damage or Destruction | **6** |
| U.S.S.G. §2B1.1(b)(16)(B) | Specific Offense Characteristic (Offense Involved a Dangerous Weapon) | **14** |
| | Total | **14** |

---

[10] The government recognizes that it provided the incorrect Guidelines calculation of the offense level to the Probation Officer and did not object to the offense level in the PSR, but on reflection the government has concluded that its initial calculation is inaccurate on Counts Three and Four.

[11] The Guidelines do not apply to Counts Six and Seven, because those offenses are petty offenses. *See* U.S.S.G. §1B1.9.

**Count Three – 18 U.S.C. § 1752(a)(1):**

| | | |
|---|---|---|
| U.S.S.G. §2B2.3(a) | Trespass | **4** |
| U.S.S.G. §2B2.3(b)(1)(A)(vii) | Specific Offense Characteristic (Restricted Building or Grounds) | **+2** |
| U.S.S.G. §2B2.3(b)(2) | Specific Offense Characteristic (Possession of a Dangerous Weapon) | **+2** |
| U.S.S.G. §2B2.3(c) | Cross Reference | |
| U.S.S.G. §2X1.1 | Attempt, Solicitation, or Conspiracy (Applies U.S.S.G. §2A2.2) | **14** |
| | Total | **14** |

**Count Four – 18 U.S.C. § 1752(a)(2):**

| | | |
|---|---|---|
| U.S.S.G. §2A2.4 | Obstructing or Impeding Officers | **10** |
| U.S.S.G. §2A2.4(b)(1)(A) | Specific Offense Characteristic (Physical Contact) | **+3** |
| | Total | **13** |

**Count Five – 18 U.S.C. § 1752(a)(4):**

| | | |
|---|---|---|
| U.S.S.G. §2A2.4 | Obstructing or Impeding Officers | **10** |
| U.S.S.G. §2A2.4(b)(1)(A) | Specific Offense Characteristic (Physical Contact) | **+3** |
| U.S.S.G. §2A2.4(c)(1) | Cross Reference | |
| U.S.S.G. §2A2.2 | Aggravated Assault | **14** |
| U.S.S.G. §3A1.2(a)-(c) | Official Victim | **+6** |
| | Total | **20** |

### **Grouping Analysis**

The victims of Counts One and Five were the police officers whose official conduct was impeded by Sargent's crimes, so those counts group. U.S.S.G. §3D1.2(a), (b). The victim of Counts Three and Four is Congress, because Sargent's crimes interfered with the Congressional vote to certify the Electoral College vote, so those counts group as well. U.S.S.G. §3D1.2(a), (b). The victim of Count Two is the Architect of the Capitol, who is responsible for the maintenance and repair of the United States Capitol Building. The result is three separate groups.

The offense level for each group is the offense level for the count with the highest offense level in the group. U.S.S.G. §3D1.3(a) The offense levels for each group are:

Group One (Counts One and Five):        20
Group Two (Count Two):                  14
Group Three (Counts Three and Four):    14

Under U.S.S.G. §3D1.4(a), one unit is added for the group with the highest offense level, and an additional unit is added for each group that is no more than four levels lower than the group with the highest offense level. Here, there are 2 units: one unit for Group One and one-half unit each for Groups Two and Three. These units result in two additional levels. U.S.S.G. §3D1.4. This results in a combined offense level of 22.

**Application of U.S.S.G. §2A2.2**

U.S.S.G. §2A2.2 (Aggravated Assault) is the appropriate Guideline for Counts One and Five because the conduct underlying these Counts is Sargent's physical assaults on officers. These assaults were "aggravated" assaults" because they were committed with the intent to commit a felony beyond the assaults themselves. PSR ¶ 47; U.S.S.G. §2A2.2, comment. (n.1) (defining "aggravated assault" as, among other things, "a felonious assault that involved . . . an intent to commit another felony."). In his statement of offense, Sargent admitted that on the steps of the North Door, he "physically and intentionally separate[d]" Officer 1 from the rioter, "thereby preventing [Officer 1] from detaining the rioter." ECF No. 37-1 at 1.

After successfully preventing the rioter's detention, Sargent continued to physically drive Officers 1 and 2 away from the North Door and to impede their ability to safely return to their position at the North Door. Sargent forced them away from the doors and the other officers stationed there and further into the chaos of the mob. The situation was dire enough that a group of officers had to push through the crowd of rioters to retrieve Officers 1 and 2. *See* Gov't Ex. 9 at 0:12-1:00; Gov't Ex. 7 19:40- 19:55. All of this assaultive conduct was performed with the intent of further obstructing officers during a civil disorder. As the Presentence Report correctly notes,

18

"Sargent assaulted officers with the purpose of preventing them from guarding the North Door and with the purpose of preventing the detention of another rioter. Accordingly, the assaults were committed with the intent to obstruct, impede, and interfere with officers in violation of 18 U.S.C. § 231(a)(3)." PSR ⁋ 26. Thus, the assaultive conduct constituted aggravated assault, and U.S.S.G. §2A2.2 is applicable.

### Acceptance of Responsibility

Probation concluded that Sargent has not clearly demonstrated acceptance of responsibility for the offenses. PSR ¶ 72. Sargent may be entitled to this reduction if, prior to sentencing, he "truthfully admit[s] or [does] not falsely deny[] any additional relevant conduct for which [he] is accountable . . . ." U.S.S.G. §3E1.1, comment. (n.1). In this case, the relevant conduct is the actions that Sargent took after he prevented Officer 1 from arresting the rioter on the steps to the North Door, and his further attempts to keep Officer 1 and Officer 2 from returning inside the Capitol.[12] As the PSR notes, Sargent's failure to provide any documents requested by the Probation Office also supports a failure to accept responsibility. PSR ¶ 48.

However, in his objections to the PSR, Sargent did not deny preventing an arrest, pushing the officers away from the North Door, or impeding their return to the North Door. *See* PSR ⁋ 16. Rather, he argues that his behavior does not constitute assault and that two officers said he was not aggressive. *Id.*[13] Similarly, he does not deny sending the messages attributed to him. *See* PSR ⁋⁋ 11(b), 12(e), 13(d). He instead claims they are taken out of context. *Id.*

---

[12] If Sargent were to receive a 3-point reduction for acceptance of responsibility, the resulting total offense level would be 19 and the Guidelines range would be 30-37 months.

[13] Defendant also states that he was not charged with assault. PSR ⁋ 16. However, U.S.S.G. §2A2.2 does not require that the assaultive conduct be charged. *See* U.S.S.G. §2A2.2 comment. (n.1) (defining "aggravated assault" as, among other things, "a felonious assault that involved . . . an intent to commit another felony.").

The government recognizes Sargent is free to argue about the context of the messages and whether his actions meet the legal requirements of assault. As long as he continues to not falsely deny the conduct itself or that he sent the messages, the government will not oppose a reduction for acceptance of responsibility. Should this situation occur, the government will ask for a sentence of incarceration at the midpoint of the guidelines after the acceptance of responsibility is taken into account.[14]

Contrary to Sargent's assertion otherwise, however, his conduct constituted an assault. PSR ¶¶ 26, 30, 51; *United States v. Watts*, 798 F.3d 650, 654 (7th Cir. 2015) ("an assault may also be committed by a person who intends to threaten or attempt to make offensive rather than injurious physical contact with the victim"); *Comber v. United States*, 584 A.2d 26, 50 (D.C. 1990) (en banc) (explaining that the crime of simple assault "is designed to protect not only against physical injury, but against all forms of offensive touching, . . . and even the mere threat of such touching"); Criminal Jury Instructions for the District of Columbia, No. 4.100 (2022 ed.) ("Injury means any physical injury, however small, including a touching offensive to a person of reasonable sensibility."). This Court has defined an assault as follows:

> The term "assault" means any intentional attempt or threat to inflict injury upon someone else, when coupled with an apparent present ability to do so. To find that the defendant committed an "assault," you must find beyond a reasonable doubt that the defendant intended to inflict or to threaten injury. Injury means any physical injury, however small, including a touching offensive to a person of reasonable sensibility.

*United States v. Alam*, 21-cr-190 (DLF), ECF No. 104 at 23. Sargent's pushing the officers away from the safety of their posting and into the morass of the mob was an assault because (1) the

---

[14] Pursuant to fn 12 above, the government would recommend a sentence of incarceration of 34 months. All other conditions of the recommended sentence would remain the same.

pushing itself is an "offensive touching" and (2) the mob engulfing the officers posed a threat of injury to them.

In support of his claim that he did not assault officers, Sargent asserts that both Officers 1 and 2 said that Sargent was not aggressive towards them. PSR ⁋ 16. This claim is false. Only Officer 2 said that Defendant was not aggressive. On this point, however, the video of the incident speaks for itself. *See* Gov't Ex. 9A. Furthermore, Officer 2 had no recollection of when Sargent began pushing Officer 1 and Officer 2 took about 17 seconds to reach the area where Sargent had pushed Officer 1. PSR ⁋ 24.

As to whether the messages are taken out of context, Defendant has all the messages Sargent sent and received. He is free to add in any "context" that he wishes, but has not done so. The messages the government has quoted fairly and accurately depict what Sargent sent to others.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a sentence of 46 months' incarceration, 36 months' supervised release, and $2,980 in restitution.

### A.  The Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Sargent's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Prior to January 6, Sargent anticipated and encouraged violence in Telegram messages with other Proud Boys. Sargent inflamed the mob at the North Door when he encouraged them to break down the North Door, which he attempted to do himself by throwing a rock-like object at the doors two times. After that, Sargent stopped the detention of a rioter who

21

had just assaulted another officer. Then, as two officers were surrounded by rioters, far away from other officers who could help them, Sargent twice shoved them and impeded the officers' return to safety. The nature and circumstances of Sargent's offenses were of the utmost seriousness, and fully support the government's recommendation of 46 months' incarceration.

### B.  The History and Characteristics of Sargent

Sargent's history and characteristics reveal no explanation for his serious criminal conduct. Sargent had a "privileged upbringing void of abuse and neglect," and has "close" relationships with his family. PSR ¶¶ 82-83. He suffers from no major mental health issues; he has attention deficit/hyperactivity disorder, but no medical intervention has been necessary. PSR ¶ 90. He has been regularly employed as an independent contractor in information technology, earning approximately $100,000 yearly. PSR ¶ 93. Despite his privilege, he still chose to engage in criminal conduct and to encourage and enable others to do so. Although Sargent has no prior criminal record, PSR ¶¶ 80-85, the § 3553(a) factors already account for this fact because they include the importance of the Guidelines, which reflect Sargent's criminal history.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Sargent's criminal conduct on January 6 was the epitome of disrespect for the law. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. Jun. 9. 2023 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power."). As such, the sentence in this case should reflect the gravity of his crimes and the Court should sentence him to a period of incarceration within the Guidelines.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[15] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. In the months leading up to January 6, Sargent spoke of the need for atrocities and a "riot." On December 15, 2020, even before President Trump's now-infamous tweet that January 6 was going to "be wild," Sargent said that the next couple of weeks were "going to be crazy," anticipated a "civil war," and alluded to refreshing the tree of liberty with the blood of tyrants. Thus, apparently expecting violence, Sargent made the trip to Washington, D.C. and joined in the riot. Then, while the riot ensued, Sargent encouraged others to attack the Capitol doors, did so himself, and pushed police officers away from their place of safety. His statements and actions show that Sargent is not repulsed by violence but is instead drawn to it. Thus, there is a significant need to specific deter any future criminal conduct by Sargent.

---

[15] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

***Sargent's Social Media***

Sargent's X, formerly Twitter, account shows his lack of remorse and need for specific deterrence. Sargent admitted to probation that he maintains a presence on X, under the name "Anthony Sargent". *See* PSR ¶ 89.

As of the date of this filing Sargent, deleted his account:



The government, however, captured screenshots of Sargent's X account prior to its deletion. Here is his account, with the name Anthony Sargent and an image of Sargent, as it looked on July 21, 2023:



Here are some screenshots exhibiting how Sargent's X account shows his lack of

remorse:

- On May 26, 2023, after members of the Proud Boys were convicted of seditious conspiracy, Sargent agreed with an analyst that "[t]his is not the end of the Proud Boys. Their threat is a larger and more decentralized network."



- On June 25, 2023, Sargent posted a video of Proud Boys "beat[ing] up" others. Although Defendant has said he only has a social media presence on X, the post links to a TikTok post from "proudboysargelaughter1." *See* PSR ¶89.



- On July 18, 2023, Sargent posted an image asking to "# Free the Proud Boys." The post links to an article, written by Zachary Rehl after he was convicted of seditious conspiracy, minimizing Rehl's conduct and the conduct of the Proud Boys that participated in the January 6 riot. *See* https://www.thegatewaypundit.com/2023/07/j6-political-prisoner-zachary-rehl-share-our-story/ (last accessed October 31, 2023). The article also seeks to raise money for Rehl. *Id.*



Sargent now comes before the Court to be sentenced on charges related to January 6. Despite having nearly three years to reflect on his conduct during the riot, Sargent, who shoved police officers at least two times on January 6, still celebrates violence. Instead of showing contrition, he promotes the idea that those convicted of other January 6 related offenses are just misunderstood patriots. These X posts show that Sargent completely lacks remorse for his actions and cares not for the damage he has wrought.

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.  The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v.*

*Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[16]

---

[16] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[17]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021 many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Narayana Rheiner*, 22-cr-108 (DLF), the defendant directed other rioters to push against a police line on the west front of the Capitol. When he reached the line himself, the defendant began to pull on an officer's shield in an attempt to disarm the officer. The defendant eventually succeeded, causing the officer to fall to the ground, which aided the rioters' attempt to breach the police line. After the rioters overran the west front, the defendant entered the Capitol where he spent approximately 13 minutes inside. While in the Capitol, the defendant joined other rioters in making threatening and aggressive statements towards police officers. The Court sentenced the defendant to 15 months' incarceration, 36 months' supervised release, and $2,000 restitution.

The driving issue at the defendant's sentencing was his criminal history category, which the Court found was IV. Sent. Hrg. Tr., Aug. 8, 2023, at 4:22-5:1. The defendant's prior

---

[17] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

convictions were tied to a long-standing drug problem, which stemmed from the defendant's childhood trauma and subsequent PTSD. Sent. Hrg. Tr., Aug. 8, 2023, at 28:8-17; 30:21-25. Despite his troubled upbringing, however, the defendant made strides to put his past behind him. *Id.* at 32:25-33:6. The defendant also pleaded guilty to a single count of civil disorder early in his case and demonstrated an acceptance of responsibility. *Id.* at 13:13-14. Sargent, on the other hand, had no such childhood. Rather, he experienced a "privileged upbringing" with no prior criminal history and thus had every opportunity to not commit these offenses. PSR ⁋ 86. Sargent also pleaded guilty to the entire indictment only a month before his trial date, nearly two years into his case. Lastly, Sargent continues to minimize his actions and statements. Therefore, a sentence higher than the one imposed in *Rheiner* is warranted for Sargent.

In *United States v. Barry Ramey*, 22-cr-184 (DLF), the defendant, a member of the Proud Boys, marched to the Capitol with other Proud Boys from the Washington Monument. As the riot developed on the West Front, the defendant positioned himself at the base of a set of stairs leading to the Upper West Terrace. At that location, rioters tried to breach a police line setup to block access to the stairs. To aid the other rioters' efforts, Ramey sprayed two officers with chemical irritant. The Court sentenced the defendant to 60 months' incarceration, 36 months' supervised release, and $2,000 restitution.

Like Ramey, Sargent is a member of the Proud Boys. Sargent, however, was not merely a member but prolifically engaged with the group and espoused ideations of engaging in riotous acts in the lead-up to January 6. During the riot, Sargent, like Ramey, engaged in a coordinated effort to breach a police line and used force to do so. As noted above, Sargent used a dangerous weapon and threw it in the direction of officers, only failing to strike them due to the reinforced glass.

Comparing these two cases counsels in favor of a similar sentence to *Ramey*, but somewhat lesser because Sargent did not succeed in striking officers with his dangerous weapon.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Sargent was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[18]

Because Sargent engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child

---

[18] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Sargent to pay $2,980 in restitution for his convictions on Counts One through Five. This amount fairly reflects Sargent's role in the offense and the damages resulting from his conduct. Of this $2,980, $2,000 reflects his smaller role in causing more than $2.9 million in general damage to the Capitol. In cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. The $2,000 portion of the restitution order avoids any sentencing disparity. Sargent was directly and personally involved in causing $980 in damage to the doors at the north entrance, including by throwing a heavy object and encouraging the use of a bike rack as a battering ram, although he was not the only rioter involved. Therefore, of the $2,980, $980 reflects his substantial role in causing damage to the doors.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 46 months' incarceration, 36 months' supervised release, and $2,980 restitution.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    */s/ Joshua Ontell*
JOSHUA ONTELL
VA Bar No. 92444
Assistant United States Attorney
601 D Street, N.W.
Washington, DC 20530
(202) 252-7706
joshua.ontell@usdoj.gov

*/s/ Andrew Haag*
ANDREW S. HAAG
Assistant United States Attorney
MA Bar No. 705425
601 D Street, N.W.
Washington, DC 20530
(202) 252-7755
Andrew.Haag@usdoj.gov