**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 21-cr-00639-DLF |
| | ) | |
| ANTHONY SARGENT, | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**DEFENDANT ANTHONY SARGENT'S SENTENCING STATEMENT**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
*Attorney for Defendant*

I.     <u>Introduction</u>

1

Comes now Defendant Anthony Sargent, by and through his undersigned counsel of record, William L. Shipley Esq., and submits to this Court his Sentencing Statement in advance of the Sentencing Hearing on November 7, 2023.

Defendant Sargent appears for sentencing before this Court having pled guilty to Counts One through Seven of the Indictment, charging him with the following violations:

1) Title 18 U.S.C. Sec. 231 (a)(3) Civil Disorder;

2) Title 18 U.S.C. Sec. 1361, 2 Destruction of Government Property;

3) Title 18 U.S.C. Sec. 1752(a)(1) Entering and Remaining in a Restricted Building or Grounds;

4) Title 18 U.S.C. Sec. 1752(a)(2) Disorderly and Disruptive Conduct in a Restricted Building or Grounds,

5) Title18 U.S.C. Sec. 1752(a)(4); Engaging in Physical Violence in a Restricted Building or Grounds,

6) Title 40 U.S.C. Sec. 5104(e)(2)(D); Disorderly Conduct in a Capitol Building; and

7) Title 40 U.S.C. 5104(e)(2)(F) Act of Physical Violence in the Capitol Grounds or Buildings.

Mr. Sargent has no prior criminal history. The Presentence Report determines that the Guideline Range is 46-57 months. The Probation Officer has recommended a sentence of 46 months of probation, and a fine.

Inexplicably, notwithstanding the fact that he pled guilty to all counts in the indictment, the Probation Officer's calculations do not involve -3 levels for "acceptance of responsibility."

Mr. Sargent entered into no agreement with the Government with regard to his guilty plea, thereby reserving all his rights to object to the factual and legal aspects of the Presentence Report. As noted below, Mr. Sargent made limited factual admissions at the time of his change of plea, with his actual admissions being sufficient to establish each of the elements of the counts to which he pled guilty – but not more than that.

The Presentence Report comes to numerous factual conclusions that are not supported by the record made during the change of plea hearing. Those unsupported conclusions are specified below. Those unwarranted factual conclusions have a significant effect on the guideline calculations, the recommended guideline range, and the sentencing recommendation made by the Probation Officer.

II.   <u>Sentencing Guidelines Calculation</u>

Defendant and the Government did not enter into a plea agreement. Rather, Defendant Sargent plead to all charges of the indictment. Mr. Sargent accepted responsibility for his conduct and was willing to admit to facts sufficient to establish his guilt as to each count charged. Mr. Sargent was not willing to accept or admit a factual basis as proposed by the Government, or to agree to other terms and conditions included in the proposed plea agreement made by the Government.

A.   <u>Objections to the Guideline Calculation As Set Forth the Presentence Report</u>

The Presentence Report determines that there are three groups of offenses for purposes of the Guideline calculations.  The highest offense level among the three groups is determined to be Level 20.  The Multiple Offense Adjustment is determined as adding +3 additional levels, with the Total Offense Level set at Level 23.  No adjustment is made for "acceptance of responsibility."

With a Criminal History Score of 0, Mr. Sargent is in Criminal History Category I.  Level 23 in Category I recommends a Guideline Range of 46-57 months.

Applying a three-level reduction for timely acceptance of responsibility, the recommended Guideline Range is reduced to 33-41 months.

For the reasons set forth below, the calculations set forth in the Presentence Report are incorrect both based on the factual record and based on the application of the guidelines to the factual record.

1.  <u>The PSR Incorrectly Uses Sec. 2A2.2 for Count 1</u>.

Mr. Sargent was not charged with "assaulting" any officer, and Mr. Phipps did not admit as part of his factual basis to having "assaulted" any officer.  The PSR determines that the appropriate Guideline provision for a violation of Sec. 231(a)(3) is Sec. 2A2.4

But without explanation a factual basis for doing so, the PSR applies the Cross-Reference at Sec. 2A2.4(c), concludes that the offense constitutes "aggravated assault," and applies the provisions of Sec. 2A2.2 pursuant to that Cross-Reference.

The phrase "Aggravated Assault" is not used in any statute to which Mr. Sargent has been charged or found guilty.  Nor is it a term that appears in the

text of Sec. 2A2.2 or Sec. 2A2.4.  A definition of "aggravated assault" is provided only in the commentary of Sec. 2A2.2, and it is defined as follows:

> "Aggravated assault" means a ***felonious assault*** that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony.  [Emphasis added].

The PSR applies Sec. 2A2.2 to Count 1 without an explanation as to why Mr. Sargent's actions constituted the crime "assault," much less "aggravated assault."

In United States v. De Silva, 21-cr-00564 (CJN), the Court defined "simple assault," as used in 18 U.S.C. § 111(a), to mean (a) an attempt to cause or purposely, knowingly, or recklessly cause bodily injury to another; or (b) negligently cause bodily injury to another with a deadly weapon; or (c) attempt by physical menace to put another in fear of imminent serious bodily injury, citing United States v. Duran, 96 F.3d 1495, 1509 (D.C. Cir. 1996).

As noted in the definition, and "aggravated assault" is premised first on their being a "felonious assault," which is accompanied by one or more additional aggravating facts as set forth in the definition.

Had the government wanted to pursue a felony assault charge against Mr. Sargent, and then argued for a sentenced based on "aggravated assault" under either Sec. 2A2.2 directly it could have done so.  But it did not.  That decision is not accounted for anywhere in the rationale – or lack thereof – advanced by PSR.

2.  <u>"Dangerous Weapon" Enhancement for Count Two</u>

Count Two, charging Mr. Sargent with destruction of government property, is charged as a misdemeanor.  Under Sec. 2B2.1 the Base Offense Level is 6.  There is no enhancement for amount of loss, which the Government acknowledges is under $1000.

Pursuant to Sec. 2B2.1(b)(16), the PSR increases the Base Offense Level to 14 "because the offense involved possession of a dangerous weapon…"

Whatever the nature of the object was that Mr. Sargent threw at the glass window, it was not recovered.  Describing it as a "dangerous weapon" is entirely based on speculation as to what that object was.  The PSR refers to it in various places as a "heavy rock-like object" or words similar to that.   But that is speculation.  Mr. Sargent could not remember what the object was, it was simply something on the ground at his feet.  The video evidence is not conclusive as to the nature of the object – if it was a "dangerous weapon," the Government likely would have taken the opportunity to charge the case differently.

A "dangerous weapon" is defined in Sec. 1B1.1(E) as follows:
"Dangerous weapon" means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g., a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

The object in question may have been a "rock" or something else that resembled a rock.  Not knowing precisely what it was makes the question of

whether it was "capable of inflicting death or serious bodily injury" a matter of conjecture.

Even if the object was a "rock", not all "rocks" are so capable.  Whether the particular "rock" thrown by Mr. Sargent was so capable is a matter of conjecture.

The factual record does not support the conclusion of the PSR that the object – whatever it may have been – thrown by Mr. Sargent at the window, but not breaking it, was an instrument that fell within the definition of "dangerous weapon" set forth in the Guidelines.  As such, the enhancement Level 14 for Count Two is not appropriate.

### 3.  Cross-Reference Application for Count Three

Count Three is charged as a misdemeanor.  The PSR identifies Guideline Sec. 2B2.3 (Trespass) as the most applicable guideline based on the facts of the offense.  The Base Offense Level is 4.

The PSR applies the Cross-Reference under Sec. 2B2.3(c), which reads:

> If the offense was committed with the intent to commit a felony offense, apply §2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that felony offense, if the resulting offense level is greater than that determined above.

Without the benefit of any analysis of the facts, the PSR (Par. 28) states "the cross-reference applies because the offense was committed with the intent to commit a felony offense," referencing Count 1.

There is no basis in the factual record to determine when Mr. Sargent crossed the "threshold" from unrestricted to restricted grounds at the Capitol, he did so INTENDING to commit the offense of civil disorder.  There is no

evidence as to when he crossed that threshold, thereby committing the crime charged, so the state of the protest/riot at that moment cannot be determined as a factual matter.

      4. <u>Application of Cross-Reference to Count Four</u>:

The PSR is not entirely clear with regard to why the cross-reference under Sec. 2A2.4(c) is referenced as to "grouping" of counts.  Regardless, Mr. Sargent believes that the base offense level for Count 4 is the same as Count 3 – Base Offense Level 4 – and there is no basis to adjust that base offense level to a higher level under Sec. 2B2.3.

      5. <u>Erroneous Use of Section 2A2.4 for Count Five</u>.

Pursuant to Appendix A of the Sentencing Guidelines, 18 U.S.C. Sec. 1752 indexes to both Guideline Sections 2A2.4 and 2B2.3.  The PRS erroneous concludes based on a mistaken factual premise, that Sec. 2A2.4 is the most applicable guideline section.

The PSR identifies the "act of violence" for purposes of sentencing under this Count as the physical encounter between Mr. Sargent and Officers 1 and 2, as it references the "underlying conduct" for this Count as the same conduct as in Count 1.  But that is not accurate.

Both Officers 1 and 2, when interviewed, stated that Mr. Sargent did not act aggressively in his interactions with him – he simply interfered with their efforts to perform their official duties.

The "act of violence" applicable to Count Five is the attempt to break out the window of the Capitol with the object that the threw against the window.

That makes 2B2.3 the applicable guideline provision pursuant to indexing in Appendix A.  The base offense level is 4.

B.     Mr. Sargent's Sentencing Guideline Calculation.

Count 1: Civil Disorder, 18 U.S.C Sec. 231(a)(3).

Section 231 is not indexed in Appendix A of the Sentencing Guidelines. As noted by the PSR, the most analogous Guideline is Sec. 2A2.4 – "Obstructing or Impeding Officers".

| | |
|---|---|
| Base Offense Level | 10 |
| Specific Offense Characteristics: | |
| ■  The Offense Involved Physical Contact | +3 |
| Adjusted Offense Level (Subtotal): | **13** |

Count 2:  Title Destruction of Government Property

Guideline Section 2B1.1:

| | |
|---|---|
| Base Offense Level: | 6 |
| Specific Offense Characteristics | 0 |
| Adjusted Offense Level | 6 |

Count 3:     Entering and Remaining in a Restricted Building or Grounds

Guideline Section 2B2.3:

| | |
|---|---|
| Base Offense Level: | 4 |
| Specific Offense Characteristics: | 0 |

Adjusted Offense Level (Subtotal):                                            4


      Count 4:     <u>Entering and Remaining in a Restricted Building or Grounds</u>

Guideline Section 2B2.3:

Base Offense Level:                                                          4
Specific Offense Characteristics:                                           0


Adjusted Offense Level (Subtotal):                                           4


      Count 5:     <u>Entering and Remaining in a Restricted Building or Grounds</u>

Guideline Section 2B2.3:

Base Offense Level:                                                          4
Specific Offense Characteristics:                                           0


Adjusted Offense Level (Subtotal):                                           4


      <u>Multiple Count Adjustment</u>:

      Using the Grouping of Counts from the PSR, Units are assigned

pursuant to USSG §3D1.4(a), (b) and (c). One unit is assigned to the group with

the highest offense level. One additional unit is assigned for each group that is

equally serious or from 1 to 4 levels less serious. One-half unit is assigned to

any group that is 5 to 8 levels less serious than the highest offense level. Any

groups that are 9 or more levels less serious than the group with the highest

offense level are disregarded.

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| Count Group 1 | 13 | 1.0 |
| Count Group 2 | 4 | 0 |
| Count 2(s) | 4 | 0 |
| Total Number of Units: | | 1 |

Greater of the Adjusted Offense Levels Above:     13

**Increase in Offense Level:** The offense level is increased pursuant to the number of united assigned by the amount indicated in the table at USSG §3D1.4                                                                                    1

**Combined Adjusted Offense Level:** The Combined Adjusted Offense Level is determined by taking the offense level applicable to the Group with the highest offense level and increasing the offense level by the amount indicated in the table at USSG §3D1.4.                                                                                  **14**

      D.    <u>Acceptance of Responsibility</u>

For reasons that are not entirely clear, the PSR does not include a reduction in the Adjusted Offense Level for "Acceptance of Responsibility."

The Defendant entered guilty pleas to each of the seven counts in the Indictment. He admitted facts sufficient to establish the elements of each of the seven offenses to which he pled guilty. His pleas were accepted by Judge Nichols based on the factual admissions made, and the answers provided by Mr. Sargent to the questions posed to him by Judge Nichols. There is no basis to deny Mr. Sargent the benefit in his guideline calculation for acceptance of responsibility.

<u>Acceptance of Responsibility</u>                                                          -2

**TOTAL OFFENSE LEVEL**                                                          **12**

With a Criminal History Category of I, and a Total Offense Level of 12, the recommended guideline range is **10-16 MONTHS**.[1]

III.   <u>The Offense Conduct</u>.

What did Anthony Sargent do on January 6, 2021?

He entered the Capitol grounds and the Capitol Building when it was unlawful to do both.  He attempted to break a window. He obstructed the efforts of federal law enforcement officers to perform their duties in securing the Capitol building, including interfering with the effort to arrest one protester in particular.

What Mr. Sargent did not do was assault any law enforcement officers – which is established most compellingly by the fact that the Government chose to not charge him with that crime under circumstances where it has showed no reluctance to file such charges when warranted by evidence.

---

[1] The PSR does note the failure of Mr. Sargent to timely produce the financial information and documents used by Probation in assessing various aspects of a defendant's current financial condition.

As noted in the PSR, the failure was caused by a sudden acute illness that required Mr. Sargent's emergency hospitalization at the very time he was putting together the information for the Probation Officer.  That information was ultimately provided, but only after the Probation Officer had finished the final PSR.  From the information that was provided late, the Probation Officer has determined that no change in the sentencing recommendation is necessary or warranted.

Mr. Sargent is a member of a Proud Boys chapter in the St. Augustine, Florida area where he lives.

Mr. Sargent was not charged with having conspired with, or engaging in any form of joint criminal activity with other Proud Boys on January 6.   He was not with members of the Proud Boy at the initial breach point – the bicycle barricade near the Peace Fountain at approximately 12:50 p.m.

He did not march to the Capitol with the hundred or more Proud Boys who marched with members of the group's national leadership.  He did not charge up the stairs on the northwest front of the Capitol behind Proud Boy Dan "Milkshake" Scott.

The general sequence of events and Mr. Sargent's conduct is accurately set forth in the PSR, with some of Mr. Sargent's objections noted therein.  Mr. Sargent renews those objections here.

But – and without diminishing the seriousness of the conduct with which Mr. Sargent pled guilty to, Mr. Sargent is, in fact, no different than more than a thousand other protestors to have now charged and/or convicted for similar conduct on January 6, 2021.

Accordingly, Mr. Sargent should be sentenced for his actual conduct in the events of the day, and not the more egregious conduct of "others" with whom the government would have Mr. Sargent be deemed guilty by association and punished accordingly.

13

Mr. Sargent offers the following additional comments and objections with regard to the Offense Conduct Section of the PSR:

Par. 12:  The Probation Officer has used the work "revolutionary" to describe what the Probation Officer thinks Mr. Sargent "viewed himself as."  A request was made to cite a message where Mr. Sargent described himself in that fashion or strike the word.  Mr. Sargent objects to this characterization that is without factual foundation.

Par. 13-15:  The Probation Officer has written into the "Offense Condcut" a string of partial messages and excerts consisting of only a few words. There is no context for the information in these paragraphs.  In fact, Mr. Sargent challenges the Probation Officer to state whether she has even read these messages completely and in context, or if the entries here as "Offense Conduct" were supplied to her word-for-word by the Government.  Mr. Sargent and his counsel suspect the latter to be true.

Par. 20:  The PSR makes reference to a "heavy" "rock-like" object.  That object was not recovered and under questioning at the change of plea hearing Mr. Sargent stated that he did not know what the object was – it was simply something on the ground that he picked up and threw.  It may have been debris of the building or something from the various areas of construction that were underway.  The video evidence does not present a clear view of the object. Further, there is no way to approximate the distance between the camera with

14

audio recording and the door that was struck by the object so no conclusions about how "loud" the object was, or what that signifies, should be drawn.

IV.   <u>Sentencing Factors Under Sec. 3553(a)</u>

Pursuant to 18 U.S.C. § 3553(a), several factors are to be considered by the Court in formulating an appropriate sentence in this case.

1.   Nature and circumstances of the offense and the history and <u>personal characteristics of the defendant</u>.

a. <u>The Nature and Circumstances of the Offense</u>.

For the most part, the events of the day on January 6 are not in dispute and need not be recounted here.  As some Judges in this District have recognized after studying the events of the day in great detail, the crowd at the Capitol that day can be generally categorized as having three primary constituent parts:

1)  A relatively small group of individuals who came to the Capitol for the purpose and with the intent to engage in violence with the goal of disrupting the Congress's certification of the 2020 Electoral Vote.

2)  A larger number of attendees who intended to protest in a loud and raucous manner as a manifestation of their unhappiness and distrust with regard to the outcome of the election -- but with no predetermined intention to engage in violence for any purpose.  Some significant number of these individuals were drawn into committing acts of violence based on events as they unfolded; and

3)  an even larger group who remained as spectators to what developed into a riot by members of the first two groups.  Some

members of this third group entered the Capitol building, walked around, and then exited without incident.

As for Defendant Sargent, his actions and the events of the offense as described in the Presentence Report, to which he has admitted, place him on the boundary between the second and third groups.  Defendant Sargent traveled to Washington, D.C. to attend the speech of President Donald Trump and to escort his friends.

Mr. Sargent discussed with friends that a large group of people from throughout the country were traveling to Washington D.C. to attend a rally and listen to a speech by former President Trump.

Mr. Sargent road in a van with a group of friends from his hometown that had been rented for the purpose of making the trip a "group affair."

Mr. Sargent arrived in Washington D.C. on the evening of January 5 and spent the night with others at an AirBNB rental unit.

On the morning of the 6th, Mr. Sargent traveled with several others to the Ellipse and watched the speech by former President Trump.  After the speech Mr. Sargent escorted some of his friends back to their hotel.  Others in the group decided to walk with the large crowd to the Capitol.  Mr. Sargent did not go with that group.

After leaving his friends' hotel, Mr. Sargent stopped at a nearby store. While inside Mr. Sargent saw crowds passing by heading in the direction away from the Capitol.  He spoke briefly with some as they passed by and was told generally what was happening, but he had no view of the Capitol building from where he was.

Mr. Sargent decided to follow other groups moving in the direction of the Capitol building. When he arrived at the Capitol grounds there were no fences of barriers that he saw, and a crowd of many thousands was on the west side of the building engaged in a massive protest. Mr. Sargent was told by others around him that "they" were letting people inside the building, and several pointed to a door where he could see0 people seemingly entering and exiting the Capitol without hindrance. As he approached, he saw no police officers or others who seemed to be government officials. Eventually he was simply in the middle of a massive crowd of protesters. The only people he could see clearly were people at the top of a large stairwell who were waving for the crowd to follow them. Having arrived long after the protest had started, Mr. Sargent observed none of the incidents of violence outside the Capitol on the West Front. He had no knowledge as to what had already happened outside the building or that members of the mob had broken windows and doors to enter the building.

When he was closer to the building Mr. Sargent could see a group of officers at the door, with members of the crowd speaking on what he thought was a police bullhorn. Mr. Sargent was too far away, and the crowd noise wa too lound, for him to understand what what being said.

While in the midst of the crowd outside, Mr. Sargent heard several people talking about individuals being "murdered" inside the Capitol and that violence continuing to take place inside. He remained outside for a significant period of time watching people in the crowd enter the Capitol through a set of glass double-doors, while others existed through the same set of doors.

Some persons exiting the Capitol did seem in distress but he was uncertain was to what the cause was for that inside.  There were others exiting the building and appearing as if nothing was wrong with them.

After watching for a period of time Mr. Sargent approached the doors and entered the Capitol himself.  In doing so he was involved in a episode of pushing and yelling with officers just inside the building who he had not seen from outside.

Mr. Sargent entered only the first set of doors into a small foyer, and a second set of doors remained that were closed.  Mr. Sargent and others with him in the foyer were sprayed with a chemical agent through a small gap in the doors when they were opened from the inside – presumably by law enforcement.  Mr. Sargent retreated out the first set of doors back to the outside.

Others in the crowd were continuing to yell about persons trapped inside the Capitol who were being injured, and who wanted to get out.  Mr. Sargent picked up an object off the ground and threw it at the glass door from a distance.  Another crowd member threw the same object at the door after Mr. Sargent.  A group of officers then came to the door -- after the object was no longer being thrown at the door.  Mr. Sargent asked and was told that on one inside was being "murdered" and there was no one fighting inside.  Mr. Sargent moved away from the doors and down a couple of steps that led to the doors, where he joined others in the crowd in continuing to protest and chant.

On a matter of feet from him, a uniformed officer jumped down from the top of the steps and tackled a woman dressed in all-black.  Mr. Sargent had not witnessed what it was that cause the Officer to act, but the Officer and the

woman ended up in the middle of the crowd rolling around on the ground.  The woman screamed and the crowd reacted in a hostile manner towards the officer who now found himself alone in the crowd.  Mr. Sargent -- afraid for the safety of both the officer and the woman – given the crowd's reaction used his arms to separate the officer from the woman.

Mr. Sargent readily acknowledges that he did not have the authority under the law to interfere with the Officer's actions.  But he was not motivated to make the situation worse – he was trying to diffuse what he though was a potential bad situation by separating the officer from the individual he was trying to arrest given the crowd's reaction.  As noted above, the Officer confirmed in an interview that he did not interpret Mr. Sargent's act as one of aggression towards him.

After the officer and the woman were separated, the officer ended up further down the stairs and deeper in the crowd.  Mr. Sargent followed down the stairs behind the officer.  He bear-hugged the officer in a protective manner – confirmed by the officer -- Mr. Sargent yelled to the officer he would protect him.

Mr. Sargent and the officer became separated as they started to move back up the stairs.  Moments later Mr. Sargent saw the same officer hit in the face and stuck by members of the crowd.  Mr. Sargent grabbed the Officer again in an afford to afford him a measure of safety while he climbed back up the stairs to the Capitol.  Other Officers then met the Officer with Mr. Sargent, and escorted him back to the police line.  Mr. Sargent departed immediately after that and went to a point down below where he line of officers come out of

19

the Capitol and told everyone to leave the Capitol grounds.  Mr. Sargent walked
with the crowd calmly away from the line of officers.

a.  <u>History and Personal Characteristics</u>.

Mr. Sargent was born in May of 1976 to a working-class family and
raised by two sets of happily married parents. His parents divorced when he
was three but shared custody of their children.  Both parents remarried when
Mr. Sargent was young and he enjoyed and was nurtured by both
environments.

Mr. Sargent had an interest in computers at an early age and his parent
fostered it.  Mr. Sargent was employed as early as 15 years of age in the
computer industry doing support for a video game company.  Mr. Sargent
attended SUNY Canton and Mater Dei College.  He did not earn a degree but he
did obtain certifications from both Microsoft and Comptia.

Mr. Sargent has no criminal record and has never been in any trouble
with the law.

Mr. Sargent has been married for 23 years to his wife Danielle, and they
have raised two sons, now 22 and 25.  They are mature adults and who make
Mr. Sargent proud to be their father every day.  Mr. Sargent has been actively
involved in the lives of his family and has been a parent-volunteers in all their
various sporting pursuits while growing up.

Mr. Sargent has already suffered as a result of his actions on January 6.
He lost a career he spent more than three decades building as a contractor for
a small Multi-State computer services Provider taking care of computer
networks for car dealerships as a network engineer from home.  Mr. Sargent
has had only 3 jobs in his adult life.  First, for 17 years he was the Information

Technology director for a north Florida car dealership group; second was the dream job as a contractor with a large multi-service computer services provider which he was fired from due to his arrest.  This is the one and only time Mr. Sargent has been fired or let go from any job in his life employment.  The 3rd job being his current employment.

Mr. Sargent is currently suffering extensive health issues from intestinal surgery.  At this point there is uncertainty with regard to how any extended period of incarceration will effect his condition as he is only a couple of months removed from the surgery and his prognosis is guarded.  This is the basis upon which Mr. Sargent is seeking a sentence of probation that includes a period of home detention as set forth below.  Such a sentence would allow Mr. Sargent to continue working as his current job involves work that he is able to do from home.  His current job is with a small firm that is dependent on Mr. Sargent, and would likely be forced to replace Mr. Sargent if he was unavailable to work for any extended period of time.

Chronic and Acute Medical Issues:

Mr. Sargent has provided to the Probation Officer medical records from the several surgeries and hospital stays over the past 10 years.

Mr. Sargent suffers from diverticulitis.  Mr. Sargent had three feet of his large intestine removed due to the growth of multiple diverticulosis in the wall of his intestine.  Mr. Sargent still has diverticulosis packets in the remaining colon.  Mr. Sargent must adhere to a special diet to avoid recurrence of diverticulitis, which is the irritation of the diverticulosis.  Additionally, bread and grains cause changes in bacteria and even small servings can cause inflammation and infection.  The long-term diverticulosis issue remains and

even with the careful diet Mr. Sargent has inflammation and other chronic conditions that can become acute and require immediate medical treatment.

Working from home allows Mr. Sargent to remain a productive member of society as he can carefully time when he is able to eat, what he can eat, and when he can engage in any type physical activities without risking an acute attack. Mr. Sargent must take a stool softener to ensure not have a blockage, which has hospitalized him several times in the last decade and most recently in September of 2023 as a result of such complications. Mr. Sargent has to be careful to recognize infection and get antibiotics quickly when needed as in a matter of hours it can be life threatening.

Mr. Sargent's thyroid has a growth on it and it does not function properly, requiring daily medications. Mr. Sargent has had issues with balancing his thyroid hormone which in turn has contributed to other hormone irregularities causing him to be treated with other hormones. When out of balance due to the medications, Mr. Sargent can become confused, agitated and lethargic. Mr. Sargent has blood work done every 3 months and it is adjusted according to weight and blood work.

Mr. Sargent been on testosterone replacement since 2017 and requires weekly does of testosterone and antiestrogen. Mr. Sargent does not produce his own testosterone and this medicine is a medical necessity. The hormonal imbalances may stem originally from the thyroid going untreated as it stopped working and Mr. Sargent was well over 300 lbs. Stopping this replacement most likely will have consequences. Aside from the physical factors, dropping hormone levels may lead to depression, insomnia, loss of appetite, and lack of

mental clarity, aka "brain fog".  This may be permanent due to the long-term replacement therapy.  A sudden stop would be dangerous.

Mr. Sargent has herniated discs in his lower back from a car accident in the early 2000s.  This and the diverticulosis up until about 10 years ago had Mr. Sargent requiring 2 hydrocodone a day to get into the and out of bed each day.  He was addicted to opioid medications for 8 years as a result.

Before Mr. Sargent was arrested, his weight was in the 240s and living healthily for a decade exercising and careful of his diet.  When Florida passed medical cannabis near a decade ago, he stopped taking hydrocodone and used cannabis in its place. Mr. Sargent's doctor prescribed it and he had a Florida medical cannabis license.  Mr. Sargent was able to lose 80 pounds and become more physically active.

His arrest made continued use of medical cannabis problematic and he quit.  Mr. Sargent has gained back 50 pounds and is now unable to be active or go to the gym when his only pain relief is in the form of Tylenol.  Mr. Sargent cannot take Ibuprofen due to his intestinal issues.

Mr. Sargent fears that any period of incarceration will lead to a use of opiates to manage pain, and a possible recurrence of his addiction.  This is a further basis upon which Mr. Sargent requests a sentence that imposes home detention rather than custodial incarceration with the Bureau of Prisons. is asking the judge to consider house arrest and or probation and or community service to pay his debt to society.  Even with the inability to use medical cannabis at home, a sentence of home detention would mean Mr. Sargent is able to continue to use specially designed areas in his house so as to not

inflame his conditions, while allowing him to continue to work with his doctor to improve his health.

DEFENDANT'S SENTENCING RECOMMENDATION

Offense Level 12 with a Criminal History Category I places Mr. Sargent in Zone C of the Sentencing Table.

Mr. Sargent requests a one level downward "variance," to Level 11, thereby placing him in Zone B of the Sentencing Table, with a recommended guideline range of 8-14 months.

That would make him eligible for a sentence of probation that satisfies the requirements of Sec. 5B1.1(a)(2), which is the imposition of a term of community confinement, intermitted confinement, or home detention sufficient to meet the minimum term of confinement in the Guideline Range.  For Mr. Sargent, that would be a term of 8 months which Mr. Sargent requests be ordered as a term of home detention.

Date: November 1, 2023                    Respectfully Submitted,

                                          /s/ William L. Shipley
                                          William L. Shipley
                                          PO Box 745
                                          Kailua, Hawaii 96734
                                          Tel: (808) 228-1341
                                          Email: 808Shipleylaw@gmail.com

                                          *Attorney for ANTHONY SARGENT*