UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 21-cr-639 (DLF) |
| v. | : | |
| | : | |
| ANTHONY SARGENT, | : | |
| | : | |
| Defendant | : | |

**GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this supplemental sentencing memorandum in connection with the above-captioned matter. In response to the Court's questions, *see* November 7, 2023 Minute Order, the government answers that (1) U.S.S.G. §2A2.2(b)(2)(B) applies to Sargent's throw of a rock-like object at the North Doors, behind which several officers stood; (2) if the Court finds that U.S.S.G. §2A2.2(b)(2)(B) or (C) do not apply to this case, the Court should depart upwards to account for the same conduct and sentence Sargent to 57 months' imprisonment; (3) Sargent is not entitled to an offense level reduction for acceptance of responsibility under U.S.S.G. §3E1.1(a); (4) the Court should impose an amount of $2,980 in restitution for Sargent's conduct, an amount which Sargent has agreed to pay; and (5) the government is not seeking a fine. In addition, in response to the Court's inquiry at the hearing, the Court must detain Sargent if it finds that he was convicted a crime of violence, but Sargent should be allowed to self-surrender if not.

**I.      Sargent used, or threatened the use of, a dangerous weapon in connection with his civil disorder offense.**

At the initial sentencing hearing on November 7, 2023, the Court found that the appropriate Guideline for Count One, a violation of 18 U.S.C. § 231(a)(3) (Civil Disorder), was U.S.S.G.

1

§2A2.4 (Obstructing or Impeding Officers). The Court then applied the cross reference because Sargent's conduct constituted aggravated assault. U.S.S.G §2A2.4(c)(1). This Guideline includes two specific offense characteristics ("SOCs") related to dangerous weapons, which could apply to this case. U.S.S.G. §2A2.2(b)(2)(B) and (C). The first SOC increases a defendant's offense level by 4 if "a dangerous weapon . . . was . . . used" during the offense. U.S.S.G §2A2.2(b)(2)(B). The second increases a defendant's offense level by 3 if it is "brandished or its use was threatened." U.S.S.G §2A2.2(b)(2)(C).

At approximately 3:50 p.m., as the officers guarding the North Door became outnumbered, they retreated into the Capitol through two sets of doors with clear glass panels. Gov't Ex. 7 at 12:00.[1] Those glass windows in the doors were untinted and totally transparent, and the officers were standing within only a couple feet of those windows. The upper halves, at least, of the officers' bodies were clearly visible through the windows.

Sargent then moved to the front of those doors only 30 seconds after the officers moved past the first set of doors. *Id*. at 12:31. At this time, Sargent admitted to "pushing and yelling with officers just inside the building" before he was "sprayed […] presumably by law enforcement." Def. Mem. at 18. The officers, who were visible through the doors' glass panels, remained at these doors for some time to protect against another breach of the Capitol. Figure 1.

---

[1] During the sentencing hearing, the Court inquired as to whether any other individual who participated in this attack of the North Door had been charged. The government is aware of several other defendants charged in connection to the assault of the North Door. *See United States v. John Thomas Gordon*, 22-cr-343 (RC); *United States v. Joseph Brody*, 22-mj-203 (GMH); *United States v. Ryan Swoope*, 23-cr-20 (TNM); *United States v. James McNamara*, 23-cr-119 (ABJ); *United States v. Christopher Roe*, 23-cr-227 (CKK).



*Figure 1: A police officer in riot gear (blue) standing behind the inner set of doors. Gov't Ex. 7 at 12:50.*

Shortly afterward, Sargent watched officers spray rioters through an opening in the doors. About 6 seconds later, he hurled the heavy rock-like object at the doors behind which the officers stood. Ex. 10 at 1:36-1:42.[2] Before he threw the object, Sargent told a rioter he needed a rock to break the glass panels. Gov't Ex. 3A.1 at 0:06-0:14.

As the Court correctly noted at the hearing, it should consider this assaultive conduct – twice hurling a heavy object at officers – when calculating the guidelines under U.S.S.G. §2A2.2, if not as part of the violation of 18 U.S.C. § 231(a)(3), then certainly as relevant conduct. Performing that calculation, it should enhance Sargent's guidelines for the use (or failing that, for threatening the use) of a dangerous weapon. U.S.S.G. §2A2.2(b)(2)(B)-(C). In addition, the rock thrown by Sargent was a dangerous weapon, because, based on its size and apparent weight, it was "capable of inflicting death or serious bodily injury." U.S.S.G. §1B1.1 cmt. n.1(I) (incorporated by §2A2.2, cmt. n.1, which also includes "any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick) if such an instrument is involved in the offense with the intent

---

[2] Exhibit 10 is a new exhibit that was not submitted with the government's original sentencing memo. It has been provided to the Court and opposing counsel and will also be provided to the media.

to commit bodily injury"); *see also* ECF No. 45 ("Gov't Mem.") at 8-10 (discussing the facts surrounding Sargent's use of the rock).³

Because the object was a dangerous weapon, but not a firearm, either subparagraph (B) or (C) of §2A2.2(b)(2) applies. For purposes of §2A2.2(b)(2)(B), the Guidelines define "[o]therwise used" to mean that "the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." U.S.S.G. §1B1.1 n.1. This specific offense characteristic does not require the defendant to actually harm, or even make contact with, the victim. In *Valdez-Torres*, federal agents surveilled a building where the defendant was staying after fleeing a federal detention facility. 108 F.3d 385, 386 (D.C. Cir. 1997). When the defendant exited the building and entered his car, the agents surrounded him. *Id.* While one of the agents was standing in front of the car, the defendant accelerated towards the agent. *Id.* The agent responded by shooting at the car, striking the defendant and causing him to miss the

---

³ At the sentencing hearing on November 7, 2023, the government argued at length as to why the rock was a dangerous weapon. Insofar as additional discussion is warranted, courts have "declined to adopt [a] restrictive interpretation . . . of the definition of what constitutes a dangerous weapon under the aggravated assault Guidelines provision." *United States v. Tolbert*, 668 F.3d 798, 802-03 (6th Cir. 2012) (citing cases from the Second, Fourth, and Tenth Circuits). "[I]n the proper circumstances," many commonplace objects with some heft and hardness "can count as a dangerous weapon, including walking sticks, leather straps, rakes, tennis shoes, rubber boots, dogs, rings, concrete curbs, clothes irons, and stink bombs." *United States v. Tissnolthtos*, 115 F.3d 759, 763 (10th Cir. 1997) (quoting *United States v. Dayea*, 32 F.3d 1377, 1379 (9th Cir. 1994)). Any inherent characteristics of an object can factor into whether it is a dangerous weapon. *E.g.*, *Tolbert*, 668 F.3d at 802 (upholding determination that a water pitcher was a weapon based not only on "size and weight" but also on "other important characteristics of the object—such as its shape, hardness, and toughness—that contribute to its potential to cause serious bodily injury"). The circumstances of its use also matter. For example, a court might conclude that a shoe is dangerous based in part on the fact that a defendant's "kicking and stomping [of the victim] was so loud that the impact was audible" as well as the fact that "serious bodily injuries resulted." *United States v. Jenkins*, 122 F. Supp. 3d 639, 647-49 (E.D. Ky. 2013). A defendant's intent to cause bodily injury can also cause an object to constitute a dangerous weapon, *see United States v. Valdez-Torres*, 108 F.3d 385, 387-88 (D.C. Cir. 1997) (upholding the application of § 2A2.2(b)(2)(B) where the defendant "intended to do bodily harm" when he accelerated a car towards the victim), but intent to do harm is not necessary for an object to be considered a dangerous weapon.

agent. *Id.* Although the defendant did not actually strike the agent with his car, the D.C. Circuit nonetheless upheld the application of §2A2.2(b)(2)(B) because the defendant intended to injure the agent by driving towards him. *Id.* at 388. Section 2A2.2(b)(2)(B) thus applies because Sargent "used" the weapon as part of the relevant offense conduct by attempting to smash the glass in the doors, when it could have seriously injured officers were the glass not ballistic.

In an attempt to dispute this narrative, Sargent argues that he was trying to get inside the Capitol to save someone in distress. ECF No. 47 ("Def. Mem.") at 18. However, given his comments about January 6 and his actions during the riot, the Court should soundly reject this claim. The more likely explanation—under the applicable preponderance-of-the-evidence standard—is that Sargent wanted to enter the Capitol Building to obstruct the certification of the Electoral College vote. *See* ECF No. 45 ("Gov't Mem.) at 3-5 (discussing Sargent's statements made about the certification process in the lead up to January 6). To achieve this goal, Sargent needed the officers protecting the Capitol to leave the area because the officers blocked his access to the building. *See* Gov't Mem. at 10-14 (discussing Sargent's attempts to remove two police officers from the North Door). Among other things, Sargent wanted the officers to leave the North Door to allow his entry. Therefore, he threw the object at the doors as part of his effort to force the officers to do so, either by allowing the rioters to enter and overwhelm the officers with their numbers, or by directly assaulting the officers and forcing them to retreat.[4]

---

[4] With this higher offense level, the Guidelines calculations as discussed in the government's sentencing memorandum have changed. Gov't Mem. at 15-18. Under the grouping analysis, Group One increases to an offense level of 24 while Groups Two and Three each remain at 14. As the difference between the highest group and the remaining groups is greater than eight, Groups Two and Three do not factor for grouping purposes. U.S.S.G. §3D1.4(c). Thus, the combined offense level is 24 with a Guideline sentencing range of 51 to 63 months' incarceration.

**II.     An upward variance would be warranted if the Court does not apply a dangerous weapon enhancement to Sargent's aggravated assault.**

In cases where the Guidelines do not adequately take into consideration some circumstances of an offense, the Court may depart upward to ensure that the applicable guideline range reflects the offense. U.S.S.G. §5K2.0(a)(2)(A). The Court may also depart upward where the Guidelines consider a relevant circumstance, but the "circumstance is present in the offense to a degree in excess of . . . that which ordinarily is involved in that kind of offense." U.S.S.G. §5K2.0(a)(3). The Court may also simply vary upward under 18 U.S.C. § 3553(a) to appropriately reflect the nature of the offense.

If the Court concludes that neither of the "dangerous weapon" SOCs under §2A2.2(b)(2) apply to Sargent's civil disorder offense, the Guidelines will not adequately account for Sargent's conduct in throwing a rock (or similar object) twice towards police officers. The damage to U.S. Capitol property that resulted from the throws and the use of a dangerous weapon during the course of that offense are considered under U.S.S.G. §§2B1.1(a)(2) and 2B1.1(b)(16)(B), respectively. This Guideline, however, applies to property damage, not the obstruction or inference of law enforcement officers. In addition, the property-destruction aspect of the throws does not capture the fact that Sargent also endangered officers. Sargent fully believed that he would be able to throw the heavy, softball-sized object through the glass windows and into a group of officers. Without the application of one of these SOCs to the civil disorder Guideline calculation, the Guidelines would not account for Sargent's assaultive conduct towards the officers. *See* Gov't Mem. at 16-17 (outlining the government's Guidelines calculation. If Sargent did not affirmatively want to injure the officers, at the very least he sought to shatter the glass panels to break into the Capitol Building. In doing so, Sargent created a risk that the object would fly into the officers, along with shards of broken glass. Without application of a §2A2.2(b)(2) "dangerous weapon" SOC, this risk is

6

unaddressed by any of the other applicable Guidelines. *Id.* Thus, if the Court finds that the dangerous weapon SOCs do not apply, then the Court should depart upward by two levels or by an equivalent variance to account for the risk created by Sargent's conduct.[5]

### III. Sargent has not demonstrated an acceptance of responsibility because he falsely denies and frivolously contests relevant conduct.

In certain circumstances, after calculating the combined offense level, the Guidelines direct courts to reduce a defendant's offense level by 2 points if the defendant clearly demonstrates acceptance of responsibility. U.S.S.G. §3E1.1(a). This Guideline provides a series of considerations for courts to review to determine if the defendant has met his burden to make such a demonstration. *Id.*, cmt.n.1(A)-(H). The first consideration is whether the defendant "truthfully admit[s] the conduct comprising the offense(s) of conviction, and truthfully admit[s] or not falsely den[ies] any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct)." *Id.* cmt. n.1(A). In addition, "[a] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility . . . ." *Id.* A defendant falsely denies relevant conduct when they deny conduct that the defendant admitted was true or the government has shown to be true. *See United States v. Leyva*, 916 F.3d 14, 27-29 (D.C. Cir. 2019). Frivolously contests means raising

---

[5] Departing or varying upward by two levels would cause the final offense level to be 24, equivalent to the offense level resulting from application of §2A2.2(b)(2)(B). In the government's original Guidelines calculation, which did not include this SOC, the combined offense level after the grouping analysis was 22. Gov't Mem. at 18. An upward departure of two levels would raise the total offense level to 24, which is the same offense level calculated by the government with the application of §2A2.2(b)(2)(B). *Supra* note 4. Thus, such a departure or variance would both adequately consider circumstances left unaddressed by the Guidelines and result in a total offense level on par with the application of the most relevant SOC even if it does not apply on its terms. Alternatively, the Court could depart or vary upward by a single level if it concluded that the most equivalent SOC was §2A2.2(b)(2)(C), the SOC for "threaten[ing]" the use of, but not using, a dangerous weapon.

"a generalized concern that the government may not have been right" without presenting any evidence to the contrary. *United States v. Gordon*, 495 F.3d 427, 432 (7th Cir. 2007).

Sargent has both falsely denied facts and frivolously contested the evidence. Sargent claimed that he did not know police officers were standing behind the doors when he threw a rock-like object at them. Plea Hrg. Tr., Jul. 21, 2023, 14:13-18 (Sargent stating the glass was "not something you could see through."). Yet, video shows that Sargent saw officers, from their position standing behind the doors, spraying a fire extinguisher at rioters just six seconds before he hurled the rock. *See* Gov't Ex. 10 at 1:36-1:42. Sargent also characterized his assault of Officer 1 as "protective" and that his intent with shoving Officers 1 and 2 away from their post was to move them towards a less violent part of the mob. Def. Mem. at 19. To support this claim, Sargent falsely asserted that Officer 1 "confirmed" that Sargent was protecting him when Officer 1 made no such statement. *Id.* Indeed, the video of the incident belies any argument that Sargent was acting altruistically. *See* Gov't Exs. 7A; 9A. Lastly, although Sargent swore to his own statement of offense that described the object he threw as "rock-like," ECF No. 37-1 at 1, and admitted to Judge McFadden that it was "rock-like," Plea Hrg. Tr., Jul. 21, 2023, 14:2-7, he now argues that there is insufficient evidence to conclude it was rock-like, Def. Mem. at 6. This self-made incongruity does not square with an acceptance of responsibility. Sargent "cannot accept responsibility for his conduct and simultaneously contest the sufficiency of the evidence that he engaged in that conduct." *Leyva*, 916 F.3d at 28-29.

Throughout the sentencing process, Sargent frivolously argued that the portions of his Telegram messages cited by the government and the Probation Office were taken out of context. Sargent made this same objection to the presentence report, PSR ¶ 12(e), in his sentencing memorandum, Def. Mem. at 14, and during the sentencing hearing. However, despite the fact that

Sargent has the complete messages in discovery and that the Probation Office brought the messages to his attention when it submitted the draft PSR on August 24, 2023, ECF No. 39, ¶¶ 11-15, Sargent at no point attempted to provide the Court with the purported context to vindicate his position. Rather, Sargent only raised a generalized concern that the government's conclusion was wrong. *Gordon*, 495 F.3d at 432. The fact of the matter is that there is no additional context to provide to these messages because their contents speak for themselves. Any claim to the contrary is baseless.

Another consideration for acceptance of responsibility is whether the defendant made a "voluntary payment of restitution prior to adjudication of guilt." U.S.S.G. §3E1.1, cmt. n1(C). As the government will discuss below, on November 17, 2023, Sargent indicated to the government that he would agree to the full restitution requested by the government. The offer to pay, however, was made months after he was adjudicated guilty by Judge McFadden on July 21, 2023, and over a week after the initial sentencing hearing on November 7, 2023. Therefore, this offer is not consistent with his acceptance of responsibility.

For these reasons, Sargent has not demonstrated an acceptance of responsibility and he is not entitled to a two-point reduction for his conduct under U.S.S.G §3E1.1(a).[6]

## IV. Restitution is warranted because Sargent proximately caused damage to the Capitol.

As noted above, on November 17, 2023, Sargent informed the government that he would agree to pay $2,980 in restitution. As restitution is no longer contested, the Court should order it in the amount of $2,980.

---

[6] Should the Court disagree (and give Sargent credit for acceptance of responsibility), and should it calculate Sargent's offense level as 16 or greater, the government would not move for an additional one-point reduction under U.S.S.G. §3E1.1(b).

For the reasons articulated in the government's filing before this Court in *United States v. Kenneth Joseph Owens Thomas*, 21-cr-552 (DLF), ECF No. 215 at 18-35 (attached as Exhibit A and incorporated by reference), the Court should endorse the agreed upon restitution amount. Although the absence of a particular defendant, or even dozens of defendants, from the mob of rioters may have made little difference to the damages caused by the riot, that does not mean that any particular rioter may avoid restitution liability because his personal contribution to the aggregate loss is *de minimis*. If that were so, most rioters would escape restitution altogether, and the victims would not be made whole. Given the broad compensatory goals of the restitution statutes, Congress could not possibly have intended that a massive, unprecedented riot causing millions of dollars of loss would not trigger *any* restitution from nearly all of those who criminally participated.

The government understands that this Court recently reached the same conclusion and imposed restitution in *Thomas*, 21-cr-552 (DLF), applying the principles of causation from in *Paroline v. United States*. 572 U.S. 434 (2014). The same result should follow here, particularly as restitution is no longer contested.

*Paroline* contemplated the award of restitution where "a wrongdoer's conduct, though alone insufficient to cause the plaintiff's harm, is, when combined with conduct by other persons, more than sufficient to cause the harm." *Id*. at 452. Such "aggregate causation theories … are []relevant to determining the proper outcome in cases like this." *Id.* at 456. So where a defendant's criminal conduct contributes, even minimally, to "the victim's general losses," he proximately caused that loss even if "it is not possible to identify a discrete, readily definable incremental loss he caused." *Id*. at 456-57. "[W]here it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court … should order

10

restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." *Id*. at 458.

The same principles apply here. As in *Paroline,* is impossible to trace a particular amount of losses to Sargent's offense conduct by recourse to a more traditional causal inquiry, but his offenses still proximately contributed to the losses the victims suffered. When properly aggregated, each January 6 defendant's conduct was a proximate cause of the losses sustained during the Capitol breach. Whether any one defendant personally hit an officer or broke a window, they were part of a collective whole that overran the outnumbered officers stationed at the Capitol, dissipating their lines, and giving others the opening to hit and break throughout the building. This is particularly true for Sargent who not only directly damaged a set of doors, but also instigated other rioters to do the same. Whereas an individual trespasser, acting alone or in a small group, might not reasonably foresee that his trespass would lead to destruction and injury, it was reasonably foreseeable for such trespass in the context of the January 6 riot to result in the damages that occurred. The police officers sought to protect the Capitol not from a single trespasser, not from several, and not even dozens, but from thousands, all of whom contributed incrementally to the harm which, in the aggregate, harmed multiple victims. Each defendant's own conduct played a part in the causal process, and each defendant is responsible for the foreseeable "consequences and gravity" of that conduct. *Paroline*, 572 U.S. at 462. Even if any one defendant's role in the overall causal process may be relatively small, that fact does not prohibit restitution outright—it just means that their share should be relatively smaller.

Therefore, the Court should impose restitution in the amount of $2,980 to account for Sargent's direct damage to the North Door of the U.S. Capitol and his participation in the general riot, which proximately caused over $2.9 million in damages.

**V.     The Court must detain Sargent if it imposes a sentence of imprisonment because he pleaded guilty to 18 U.S.C. § 1752(a)(4)**

In general, "[a] person who has been sentenced to a term of imprisonment . . . shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed." 18 U.S.C. § 3621(a); *see also* 18 U.S.C. § 3143(a)(1) (a court "shall order that a person who has been found guilty of an offense and who is waiting . . . execution of sentence . . . be detained."). If a defendant is found guilty of, among other things, a crime of violence, the court shall detain the person unless "(i) [the court] finds that there is a substantial likelihood that a motion for acquittal or new trial will be granted; or (ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person." *Id.* § 3143(a)(2)(A) (citing to 18 U.S.C. § 3142(f)(1)(A)-(C) for list of relevant offenses). Section 3156(a)(4) defines a crime of violence as:

> (A)   an offense that has an element of the offense the use, attempted use, or threatened use of physical force or property of another;
>
> (B)   any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense;
>
> (C)   any felony under chapter 77, 109A, 110, or 117[.]

"In this Circuit, courts identify crimes of violence on a categorical basis by reference to the elements of the charged offenses, rather than on a case-by-case basis through a fact-intensive analysis of the defendant's alleged conduct." *United States v. Sabol*, 534 F. Supp. 3d. 58, 68 (D.D.C. 2021) (citing *United States v. Singleton*, 182 F.3d 7, 10-12 (D.C. Cir. 1999)). If the offense involved is not subject to 18 U.S.C. § 3143(a)(2), a defendant may be released pending the execution of their sentence if the court "finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community." *Id.*

In *United States v. Harris*, Judge Nichols detained the defendant after trial upon a finding that his conviction for engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4), was a crime of violence. 21-cr-189 (CJN), ECF No. 75; *see also United States v. Christensen*, 21-cr-455 (RCL), September 18, 2023 Minute Order. In *Harris*, the defendant did not contest that § 1752(a)(4) was a crime of violence, but instead argued for a statutory construction that exempted the offense from the scope of 18 U.S.C. § 3143(a)(2). *Id.* at 1-3. The finding that § 1752(a)(4) is a crime of violence, however, comports with the categorical approach in applying the statutory framework. *Sabol*, 534 F. Supp. 3d. at 68. The elements of the offense are (1) the defendant engaged in an act of physical violence against a person or property in, or in proximity to, a restricted building or grounds, and (2) the defendant did so knowingly. 18 U.S.C. § 1752(a)(4). As the terms "an act of physical violence" and the "use . . . of physical force" are substantially identical, they should be given similar meanings. Thus, because an element of § 1752(a)(4) is "the use, attempted use, or threatened use of physical force against the person or property of another," the offense is a crime of violence. 18 U.S.C. § 3156(a)(4)(B). In this case, Sargent pleaded guilty to Count Five of the Superseding Information, which charged Sargent with this offense. ECF No. 19 at 3. Therefore, if the Court imposes a sentence of imprisonment, the Court must detain Sargent unless the Court finds that there is a substantial likelihood that a motion for acquittal or new trial will be granted. 18 U.S.C. § 3143(a)(2)(A)(i).[7]

If, however, the Court determines that Sargent's conviction under § 1752(a)(4) is not a crime of violence, it need not detain Sargent and can allow him to self-surrender. Sargent must still be detained unless the Court finds that he does not pose a risk of flight or threat to others. 18

---

[7] The government is asking for a term of incarceration, so the alternative subsection under 18 U.S.C. § 3143(a)(2)(A)(ii) does not apply.

U.S.C. § 3143(a)(1). However, the evidence suggests that Sargent is not a flight risk or a threat to others. Sargent was arrested in connection to this case on September 21, 2021. Since then, he has remained on his conditions of release without issue. Other than this case, Sargent has no prior criminal record indicating a risk of harm to a particular individual or the community. Therefore, if the Court finds that § 1752(a)(4) is not a crime of violence, the government will not seek Sargent's detention after sentencing.

### VI. The government does not seek a fine.

In January 6 cases, the government generally only seeks a fine where the defendant sought to profit based on their conduct during the riot. *See, e.g.*, *United States v. Daniel Goodwyn*, 21-cr-153 (RBW) (seeking a fine of $25,676 where the defendant fundraised to "help with things such as . . . activism, and [his] daily life."). In this case, while the government is aware that Sargent fundraised following his arrest, this fundraising appears to be directed towards his legal defense. As the government is unaware of any attempt by Sargent to profit on his conduct, the government does not seek a monetary fine as a part of his sentence.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: */s/ Andrew Haag*
ANDREW S. HAAG
Assistant United States Attorney
MA Bar No. 705425
601 D Street, N.W.
Washington, DC 20530
(202) 252-7755
Andrew.Haag@usdoj.gov

*/s/ Joshua Ontell*
JOSHUA ONTELL
VA Bar No. 92444
Assistant United States Attorney

Case 1:21-cr-00639-DLF   Document 56   Filed 11/17/23   Page 15 of 15

Case 1:21-cr-00639-DLF   Document 56   Filed 11/17/23   Page 15 of 15

601 D Street, N.W.
Washington, DC 20530
(202) 252-7706
joshua.ontell@usdoj.gov

15